IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

JUL 2 6 2011

JULIA C. DUDLEY, CLERK
BY: _Fan Coleman_
DEPUTY CLERK

JAMES BROOKS, ET AL.,

*Plaintiffs,*

v.

HOWARD R. ARTHUR, SR., ET AL.,

*Defendants.*

CASE NO. 6:08-cv-00028

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court upon Defendants' Motion for Summary Judgment, filed on May 24, 2011 (docket no. 66). I have fully considered the arguments and authorities set forth in the parties' filings, as well as those presented at the July 11, 2011 hearing. For the following reasons, I will grant Defendants' Motion for Summary Judgment.

## I. BACKGROUND

This action concerns 42 U.S.C. § 1983 and tortious interference claims brought by James Brooks and Donald Hamlette ("Plaintiffs"), who were employees of Rustburg Correctional Unit #9 (the "Unit"), located in Rustburg, Virginia. The complaints name Plaintiffs' supervisors Howard Arthur, Sr. and Randal Mitchell ("Defendants") as defendants in their individual capacities. On September 2, 2008, Brooks, Hamlette, and Samuel St. John, another former employee of the Unit, filed separate complaints against Defendants. The three cases were consolidated and then dismissed without prejudice with leave to amend. On March 16, 2009, Brooks, Hamlette, and St. John filed amended complaints.[1] Count I of the amended complaints

---

[1] St. John passed away after the filing of his initial complaint.

- 1 -

of Brooks and Hamlette alleged a claim under § 1983 against Arthur for retaliation for the exercise of Plaintiffs' speech protected by the First Amendment. This count concerns the disciplinary notices that Arthur issued to Brooks, Hamlette, and St. John, allegedly in retaliation for the lodging of an employment complaint and other speech activities. Count II alleged a § 1983 claim against Arthur and Mitchell for deprivation of Plaintiffs' due process rights under the Fourteenth Amendment. This count concerns alleged interference by Arthur and Mitchell with the employment dispute process through witness intimidation. As Plaintiffs do not oppose the entry of judgment for Defendants on the Count II claims, Defendants' motion will be granted with respect to Count II, and I will not consider further the due process issue in this opinion. Count III alleged a state law claim against Arthur of tortious interference with Plaintiffs' employment contract with Virginia's Department of Corrections (the "Department"). Plaintiffs seek, among other things: a declaratory judgment that Defendants violated Plaintiffs' First Amendment rights secured by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. § 1983, and the laws of Virginia; compensatory damages for loss of salary and other associated employment benefits, humiliation, damage to reputation, mental and emotional distress, and pain and suffering; and punitive damages.

Previously, I granted Defendants' motion to dismiss the amended complaints, ruling that the § 1983 counts were barred by res judicata, and declining to exercise supplemental jurisdiction over the state law claim. *Brooks v. Arthur*, 611 F. Supp. 2d 592 (W.D. Va. 2009). I held that the Department and Defendants were in privity during employment dispute resolution administrative proceedings brought against the Department. *Id.* at 602. On appeal, the United States Court of Appeals for the Fourth Circuit reversed, holding that there was no privity between the Department and Defendants in their individual capacities, so the § 1983 actions

were not barred by res judicata. *Brooks v. Arthur*, 626 F.3d 194 (4th Cir. 2010). On remand for further proceedings, I severed St. John's amended complaint from the amended complaints of Brooks and Hamlette and stayed the case as to St. John's complaint until a legal representative could be identified or his complaint could be properly dismissed. As to Plaintiffs' claims, Defendants filed the motion for summary judgment presently before me.

The relevant facts are as follows. Brooks and St. John were employed as Senior Corrections Officers at the Unit and were under the direct supervision of Lieutenant Hamlette. Hamlette, in turn, was supervised by Arthur, the Superintendant of the Unit, and Mitchell, the Assistant Superintendant (also called "Major") and Arthur's second-in-command. On April 7, 2006, Brooks met with Althea McKnight, a personnel assistant with the Equal Employment Opportunity ("EEO") office of the Department, to report problems with Arthur and Mitchell. Notes from their meeting show that Brooks communicated that Arthur had a "[h]istory of targeting people" at the Unit and Brooks was "the target now." The notes also show that Brooks recounted that in response to a question he posed to Mitchell, Mitchell told him—in front of inmates—that there were "[p]lenty of other jobs" if he did not like his job. The notes indicate that McKnight reviewed the grounds for bringing an EEO discrimination charge with Brooks and concluded that his complaints did not make out a proper charge. No EEO complaint was formally filed, and there is no evidence that an investigation was initiated. On May 9, 2006, Brooks met with Larry Huffman, the Regional Director for the Department and Arthur's direct supervisor at that time, regarding his complaints. Huffman testified that Brooks reported to him that Mitchell reprimanded Brooks in front of inmates, which is against Department policy. Huffman Dep. 16:13-22, May 2, 2011. Huffman also testified that Brooks reported to him that in relation to a concern Brooks had brought to Hamlette, and Hamlette had raised to Mitchell,

Mitchell had said "fuck Brooks." *Id.* at 16:22-17:2. Shortly after his meeting with Huffman, according to Brooks's testimony, Arthur called him into his office to personally discuss his recent complaints. Brooks Dep. 52:9-54:2, May 3, 2011. At that meeting, Brooks testified that Arthur told him "you won't hear anything" about the complaints he made to Huffman. *Id.* at 54:4-14. Arthur attests that at the meeting he urged Brooks to bring his problems directly to him rather than to Huffman, and that he did not make any threats. Arthur Decl. ¶ 19, May 19, 2011.

Hamlette also experienced problems with Arthur and Mitchell at the Unit. On April 21, 2006, Hamlette filed an EEO complaint alleging that Defendants discriminated against him on the basis of race, color, and religion. Brooks and St. John were identified as witnesses who could support Hamlette's contentions. Hamlette, the only African-American lieutenant employed at the Unit at that time, complained that he was treated differently than the other lieutenants at the Unit. The EEO complaint describes at least six discrete incidents of selective treatment. First, Hamlette stated that Arthur and Mitchell only performed night shift security checks on his shift, despite the existence of problems on other shifts. Second, Hamlette alleged that he had a meeting with Mitchell during which Mitchell told him that both he and Arthur "knew how to put pressure" on employees so as to "force them to tranfer [sic] or leave the Unit." Third, Hamlette described how on March 29, 2006, when he arrived at the Unit for the start of his shift, Arthur and Mitchell were investigating the disappearance of a cell phone and "didn't bother to inform me what was going on but they included Lieutenant Day." After the conclusion of the investigation, Mitchell asked Hamlette whether an inmate had told him where the cell phone was, and that question "really hurt" Hamlette because it insinuated that Hamlette would not have informed his superiors about the cell phone's location even if he had known. Fourth, Hamlette reported that he wrote up a charge for an inmate for using vulgar or insolent language

toward him, which Hamlette felt was disrespectful.  Pursuant to procedure, the inmate was offered a penalty for the charge, which the inmate could accept, or he could choose to have a formal hearing held on the charge.  When the inmate did not accept the offered punishment, rather than holding a hearing on the charge, Hamlette stated that Arthur and Mitchell dropped the charge, allowing the inmate to go without punishment.  Hamlette complained that Arthur proceeded on a charge for receiving a tattoo written by Lieutenant Timothy Davis against the same inmate Hamlette had written up for profanity.[2]  Fifth, Hamlette complained that he was instructed to report to duty in the kitchen at 4 a.m. but Lieutenant Davis was not required to do so.  Hamlette stated that Davis asked Mitchell about whether Hamlette would have to continue reporting to the kitchen, and Mitchell responded that because Hamlette had not asked him for a reprieve from kitchen duty, to "let his 'ass' continue to go into the kitchen."  Sixth, Hamlette complained that Cheryl Goodwin, who was the food service supervisor, wrote a charge on an inmate for using vulgar or insolent language and Mitchell responded by offering the inmate five days in isolation, which the inmate accepted.  Hamlette concluded the complaint with the following statement:

> I would like to know why the food service supervisor can be disrespected enough to have an inmate locked up but when I am disrespected the inmate walks or the charge is thrown out.  Is it because I am a minister or because I am the only black lieutenant. I just want to be treated just like all the other lieutenants.

At deposition, Hamlette described his religious affiliation as "Baptist, Christianity."  Hamlette

---

[2] Hamlette later testified that he felt disrespected by the decisions made by Arthur and Mitchell about when to proceed on a charge on an inmate, as he believed the other lieutenants were not treated in this manner when they wrote charges.  Defendants submitted a Disciplinary Office Report with their brief supposedly pertaining to the charge Hamlette wrote that shows that the charge was in fact prosecuted at a hearing, but the inmate was found not guilty after considering the evidence.

Dep. 21:4-6, May 3, 2011.[3]

In July 2006, the EEO office requested information from Arthur and Mitchell with respect to Hamlette's complaint. The requests for information did not name the supporting witnesses listed by Hamlette in the EEO complaint and did not include Hamlette's original complaint. Rather, the requests summarized Hamlette's allegations. Arthur and Mitchell assert that the requests for information first provided them with notice of Hamlette's EEO complaint. Arthur Decl. ¶ 14; Mitchell Decl. ¶ 12, May 23, 2011. The EEO office also sent letters to the witnesses identified in the complaint, including Brooks and St. John, seeking information about the allegations. The requests for information directed to the witnesses were enclosed in envelopes marked "Confidential" that were placed in open Unit mailboxes such that other employees could view which employees received them. Michael Dep. 78:13-24, May 2, 2011. The responses to the requests to the witnesses were due on August 31, 2006.

Plaintiffs supplied evidence of three "reports" on the activities of Brooks, Hamlette and St. John prior to the date the witness responses were due. First, on August 29, Goodwin wrote an email to Arthur describing a conversation she had with Hamlette. Goodwin wrote "Hamlette told me that things were going on here that we did not have to tolerate and we should stick together as a group to stop it. He told me that when he put in his complaint he was going all the way with it and was not going to let it go until something was done to correct the problem." Arthur testified that he did not know why Goodwin had sent him the email, and that he had not asked her to report on the activities of Hamlette. Arthur Dep. 60:4-22. Second, the record

---

[3] Plaintiffs direct me to evidence in the record that they claim shows that favoritism and intimidation were used to manage other employees at the Unit as well. For example, Corrections Officer Jeffrey Michael testified that "Arthur used threats, intimidation to rule the staff" for many years, causing many people to leave the Unit. Michael Dep. 71:22-72:2, May 2, 2011. He averred that Arthur favored "pets" among his staff, held those favored staff members to lesser standards, and selectively enforced discipline. *Id.* at 15:12-17:5. Officer Michael kept a log book in which he documented many instances of what he regarded as selective behavior, favoritism, and retaliation.

contains a handwritten note or memorandum by Corrections Officer Steve Livesay that states that on August 24, he saw Brooks holding an envelope marked confidential. Third, three incident reports prepared by Corrections Officer John Trent, dated August 16, August 25, and August 28, describe statements Hamlette and Brooks made to Trent and others about the EEO complaint and identify with which officers Hamlette and Brooks had conversations about the EEO complaint. The reports do not describe any "incidents" other than the behavior of Hamlette and Brooks during this period.

One day before the witness responses to the EEO information requests were due, on August 30, 2006, Arthur issued three Group III notices—for which termination is the typical penalty—to Hamlette, Brooks, and St. John.[4]  Pursuant to the disciplinary notices, Arthur terminated the employment of Brooks and Hamlette effective September 1 and St. John effective September 5. Arthur disciplined the employees for several purported violations that he observed while performing a required monthly security inspection of the Unit on August 30. Arthur Decl. ¶ 3. In his declaration, Arthur described the violations as follows:

> It was 2:20 a.m., August 30, when I arrived at Rustburg Unit #9 to conduct a security check. At that time of night the inmates should be asleep in the two dorms. At about 2:23, through the monitors, I saw Officer Brooks, alone, at the dorm post with his feet propped up and inattentive. The second officer, Officer St. John was not at the post although two officers were supposed to man the dorm post. For more than 35 minutes (as long as 47 minutes) Brooks remained alone. (Officers have telephones which could be used to contact others for assistance in conducting rounds, for example.) I watched the failure to make rounds when rounds should have occurred at 2:30 a.m. and then at 3:00 a.m. There were three officers on the front gate (St. John, Michaels, and Lt. Hamlette). At 3:05, St. John came from the front gate toward the dorms and arrived on the hill at 3:12. At 3:30, St. John let the inmates out of

---

[4] Unacceptable behavior of corrections officers is divided into three groups, based on the severity of such behavior. Group III behavior is the most severe and normally warrants termination. Group II behavior is less severe than Group III behavior such that it normally takes an accumulation of two Group II offenses to warrant termination. Group I behavior is the least serious form of offense. *See Brooks v. Arthur*, 626 F.3d 194, 196 n.3 (4th Cir. 2010).

> the dorms to the kitchen for breakfast preparation. Through 3:55
> a.m. no rounds were made. At 4:00 a.m. I saw St. John and Brooks
> completing count sheets although no count of the inmates had been
> made. At 4:05 a.m., Brooks was at the front gate when he should
> have been in the kitchen supervising the inmates there. Nobody
> was supervising the inmates in the kitchen through 4:40 a.m.

Arthur Decl. ¶ 7. Arthur also found log entries reporting rounds and counts that he attests were

not properly made. *Id.* at ¶ 8. Partially completed count sheets, pre-signed, were found in

violation of the requirement that counts only be recorded when made. *Id.* at ¶¶ 8, 11; *see also*

Va. Dep't of Corrections, Operating Procedure 410.2 ("The count sheet will be verified and

signed by both counting officers upon completion of the physical count."). According to the

Group III notice, Hamlette was terminated for gross negligence in not having his posts manned

as required, knowingly letting an officer vacate the kitchen post when inmates were present,

inadequate staffing in the housing unit, and failure to check the kitchen at 4:00 a.m. as instructed.

Brooks was terminated for false handling of prisoner count records, vacating a security post

without proper relief, and non-compliance with post orders regarding the conduct of rounds.[5]

    In response to the Group III notices and terminations, Brooks, Hamlette, and St. John

each filed grievances with the Department of Employment Dispute Resolution ("EDR").

Although the administrative hearing officer found that Hamlette committed six instances of

misconduct, the officer reduced Hamlette's Group III notice to a Group II notice, and reinstated

Hamlette to his position as a corrections officer with a ten workday suspension and an award of

back pay. The EDR hearing officer also reduced Brooks's Group III notice to a Group II notice,

---

[5] Plaintiffs claim that the disciplinary notices were "bogus." Pls.' Br. Opp'n at 7-8. "[I]n almost all key respects," contend Plaintiffs, Brooks, St. John, and Hamlette did not engage in the conduct of which they were accused, and their conduct was consistent with their training and regular practice at the Unit. *Id.* Further, Plaintiffs assert that the conduct of which they were accused was not typically the kind of conduct for which discipline, especially termination, was issued. *Id.* On the question whether the disciplinary notices were warranted, the evidence is disputed, and the proper interpretation of Department policy on performance of rounds is contested. Because Defendants' motion can be addressed without determining the validity of the Group III notices, I need not outline the evidence in detail here.

and reinstated Brooks to his position as a corrections officer with a ten workday suspension and an award of back pay. The same day, St. John's Group III notice was reduced to a Group II notice and he was reinstated.

## II. STANDARD OF REVIEW

The court should grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Once a motion for summary judgment is properly made and supported, the non-moving party may not rely merely on allegations or denials in its own pleading, rather it must set out "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III. DISCUSSION

### A. Evidentiary Objections

At the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The objection functions much as an objection at trial. Fed. R. Civ. P. 56 advisory committee's note. "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* Of the numerous objections raised by the parties, I need only decide those pertaining to evidence that is material to dispose of the motion for summary judgment before me. Objections not discussed below are denied as moot.

First, Defendants object to the admissibility of certain statements by Hamlette and Brooks made in the course of presenting their complaints to the Department. The statements in question are a) Hamlette's statement in his EEO complaint that Mitchell told him that Mitchell and Arthur knew how to pressure an employee to quit or transfer; b) Hamlette's statement in his EEO complaint that Arthur had Hamlette's charge against the inmates dropped; c) Brooks's statement in his complaint to the EEO office that Arthur has a history of targeting employees and was targeting Brooks; and d) Brooks's complaint to Huffman that Mitchell dressed down Brooks in front of inmates. One of the principal issues in this litigation is whether the complaints of Hamlette and Brooks were brought as citizens on a matter of public concern. All of the statements listed above are part of the speech in question. The content of the very speech at issue undoubtedly is admissible in a First Amendment retaliation claim for the purpose of determining whether it is protected speech made as a citizen on a matter of public concern.

Second, Defendants object to the statement made in Plaintiffs' brief that Hamlette alleged in his EEO complaint that Arthur and Mitchell frequently held meetings regarding Unit policies outside of Hamlette's presence. Defendants point out that the EEO complaint only alleged that Hamlette was excluded from one meeting of that variety, the one involving the missing cell phone. I agree that Plaintiffs' characterization of the EEO complaint is inaccurate in this respect. I will consider only those allegations actually contained within the EEO complaint, regardless of how they are described by either party.

Next Defendants argue for the inadmissibility of Corrections Officer Jeffrey Michael's testimony about threats and the "culture of intimidation" at the Unit and of Michael's log of incidents that he believed showed favoritism on the part of his superiors. Defendants argue that this evidence is irrelevant and too remote to be probative. I disagree. This evidence is relevant to providing context for Plaintiffs' complaints about the favoritism, intimidation, and retaliation they alleged pervaded the Unit. The context within which speech is made is salient to its classification as speech on a matter of private or public concern, though the content of the speech remains paramount. *See Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (stating that the status of protected speech "must be determined by the content, form, and *context of a given statement, as revealed by the whole record*") (emphasis added). Context helps distinguish speech that concerned systemic issues affecting multiple persons or the community at large from speech related to purely personal grievances. *See, e.g., Campbell v. Galloway*, 483 F.3d 258, 269 (4th Cir. 2007) (citing evidence that female plaintiff's complaint that male police officers did not back her up on dangerous calls was echoed by another female officer); *Scruggs v. Keen*, 900 F. Supp. 821, 830-31 (W.D. Va. 1995) (relying in part on evidence of racial tension in school at time of speech and parents' concern with treatment of black students in finding that teacher's

comment on interracial dating was of public concern). In addition, a First Amendment retaliation claim calls on a court to balance an employee's interest in speaking on matters of public concern against the state's interest in providing public services. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006). The context of an employee's speech must be taken into account in this inquiry. *Id.*

Defendants next object to Lieutenant Day's testimony that in a conversation with Brooks, he warned Brooks that he had "opened up a hornet's nest" with his complaints and that he had better "call[] the dogs off" if he wanted to move from the night shift to the day shift. Day Dep. 17:24-20:3. Defendants claim that this testimony is "ambiguous and of questionable relevance" and is "[l]ay opinion not based upon any defined and relevant perceptions of the witness." Defs.' Reply Br. at 5. Although arguably relevant to supply context for Plaintiffs' complaints, Day's testimony is speculative lay opinion without a basis in any meaningful perceptions. Lacking any explanation by Plaintiffs of the ground for the testimony's admissibility, the evidence is indistinguishable from unattributed rumor and would not be admissible at trial. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967, 967 n.4 (4th Cir. 1995).[6]

Defendants also object to the various reports made by Goodwin, Livesay, and Trent in the weeks before the EEO requests for information from the witnesses were due. Defendants argue the reports are ambiguous and irrelevant. I find them relevant to Plaintiffs' burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in inducing the adverse action. *See Peters v. Jenney*, 327 F.3d 307, 323 (4th Cir. 2003). That various corrections employees were monitoring and reporting on the

---

[6] Even if Day's testimony is considered in this motion, it would not change my conclusions on the character of the speech involved.

activities of Hamlette and Brooks—especially those actions related to the EEO investigation—tends to make more probable that Arthur was particularly concerned about the EEO complaint and its investigation. It casts doubt on Arthur's assertion that he "was not anxious or threatened by the inquiry; at age 67 (at the time) there are greater concerns." Arthur Decl. ¶ 14. Moreover, the evidence tends to show that Arthur knew or could have learned through the reports that Brooks was a witness in the investigation, a fact of which Arthur denies having knowledge. Alternatively, evidence tending to show that Arthur placed Brooks and Hamlette under surveillance by their coworkers is pertinent to the question whether Arthur's actions arose from some personal motive and therefore were taken outside the scope of his employment, which is addressed in the tortious interference with contract claim.

Finally, Defendants object to the following phrases and descriptions of the facts used in Plaintiffs' brief: "Notwithstanding Arthur's comments about Brooks and his complaints, the Department's EEO Office moved steadily forward with its investigation into Lt. Hamlette's complaints against Arthur and Mitchell," "Arthur Pre-empts the Investigation," and "[u]ltimately, [Plaintiffs' grievances] were successful." These objections do not directly relate to the admissibility of evidence but are better viewed as disagreements with Plaintiffs about the inferences to draw from the evidence. Parties customarily attempt to present the facts in their briefing with a gloss favorable to their position. It is unavoidable that parties will use the same facts to tell competing versions of the events in question. Disagreements over the choice of particular words or phrases to describe evidence in the record or over the import of the evidence can and should be articulated in the briefs themselves. They should not be fashioned into evidentiary objections under Rule 56(c)(2).

## B. Count I: Retaliation Claim Under 42 U.S.C. § 1983

Plaintiffs allege that Arthur terminated Hamlette and Brooks in retaliation for making complaints about their working conditions and that those complaints constituted First Amendment speech protected under § 1983. They also allege that Brooks's termination was in retaliation for his participation in the investigation of Hamlette's EEO complaint and that such participation is protected speech. The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). A public employer contravenes a public employee's First Amendment rights when it discharges or refuses to rehire the employee, or when it makes decisions relating to promotion, transfer, recall, and hiring based on the exercise of that employee's free speech rights. *Ridpath*, 447 F.3d at 316. In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the three-prong test laid out in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998). *Ridpath*, 447 F.3d at 316. First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. *Id.* Second, the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public. *Id.* Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action. *Id.* To avoid summary judgment on the retaliation claim, Plaintiffs must adduce evidence sufficient to show material facts in dispute as to each of the three prongs of the *McVey* test. *Adams*, 640 F.3d at 561.

The first prong, whether the employee's speech addressed a matter of public concern, is "the threshold question." *Ridpath*, 447 F.3d at 316 n.26. An employee's speech involves a

matter of public concern if it addresses "an issue of social, political, or other interest to a community." *Id.* at 316 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000) (en banc)). While "[t]he inquiry into the protected status of speech is one of law, not fact," *Connick*, 461 U.S. at 148 n.7, such status "must be determined by the content, form, and context of a given statement, as revealed by the whole record," *id.* at 147-48. It does not matter "how interesting or important the subject of an employee's speech is." *Urofsky*, 216 F.3d at 407. Nor does it matter whether the speech at issue was made in a private or public setting. *See Love-Lane v. Martin*, 355 F.3d 766, 777 (4th Cir. 2004). "An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace." *Urofsky*, 216 F.3d at 407. Where an instance of speech touches upon both public concerns and personal grievances, the threshold question is met and the court must proceed to "weigh whatever public interest commentary may be contained" in the speech "against the state's dual interest as a provider of public service and employer of persons hired to provide that service." *Stroman v. Colleton Cty. Sch. Dist.*, 981 F.2d 152, 158 (4th Cir. 1992); *see also Campbell*, 483 F.3d at 267-68.

Crucial to this case is the distinction drawn in the case law between protected speech on matters of public concern and unprotected speech on personal employment disputes. "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Campbell*, 483 F.3d at 267. Matters of internal office policy, such as "mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord" are not of public concern. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d

337, 352 (4th Cir. 2000). Otherwise, "virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.* (quoting *Connick*, 461 U.S. at 149).

I address the statements made in Hamlette's EEO complaint first. In their motion for summary judgment, Defendants argue that Hamlette was not advocating a public concern, but rather was pleading to be treated like the other lieutenants at his place of employment. Defendants maintain that while Hamlette cited his race, color, and religion, "he did not have a single direct indicator (for example, a racial epithet) and he did not cite fellow protected persons experiencing the same difficulties." Defs.' Br. Supp. Mot. Summ. J. at 16. Plaintiffs respond that no epithets are required; Hamlette alleged differential treatment based on race and religion, and these allegations are worthy of public concern. I acknowledge that "[c]omments on racial discrimination are, generally speaking, matters of public concern." *Scruggs*, 900 F. Supp. at 830 (citing *Connick*, 461 U.S. at 146). Yet it is not contended by Plaintiffs that every complaint of racial or religious discrimination is protected per se under § 1983. *See Campbell*, 483 F.3d at 268 ("While a complaint about sexual harassment certainly can amount to a matter of public concern, we have held that a complaint about sexual harassment or discrimination is not *always* a matter of public concern."). Determination of the nature of the speech is made according to a fact-specific inquiry in each case by considering the content, form, and context of the speech, *Connick*, 461 U.S. at 147-48.

Complaints about discrimination in the workplace that went beyond mere personal employment grievances have been found to be of public concern. In *Cromer v. Brown*, black deputies employed by the county sheriff's department formed the Black Law Enforcement Officers Association, and, as a group, sent a letter to the sheriff making the following charges of

discrimination by an "overall white [management] structure": "1) ineffective minority recruitment efforts, (2) lack of opportunity for black officers to cross-train in and transfer into prestigious units, such as white collar and major crimes, (3) lack of promotional opportunities for blacks and loss of faith in the promotion process, (4) methods of investigation by the all-white internal affairs unit that caused racial polarization, and (5) favoritism to white officers in the allocation of new equipment." 88 F.3d 1315, 1325 (4th Cir. 1996). The Fourth Circuit held that the letter touched on matters of public concern. It reasoned that the members of the officers association spoke as citizens in their "concern about the inability of the sheriff's office to carry out its vital public mission effectively." *Id.* at 1325-26. The court stated that the allegations of racial discrimination within a law enforcement agency were themselves matters of serious public import. *Id.* at 1326. In addition, the Fourth Circuit gave weight to the fact that the letter was a "group effort by black officers" to express concerns about discrimination in the office and was delivered "in the context or circumstance of a group complaint." *Id.* The court pointedly stated that it "was not the expression of a single disgruntled employee about a personal employment dispute." *Id. See also Love-Lane*, 355 F.3d at 777 (observing that plaintiff's speech "did not relate to a private issue between [plaintiff] and her employer," rather, "it dealt with an issue of major concern to many in the [] school community, including teachers, parents, and students"); *Howze v. Va. Polytechnic*, 901 F. Supp. 1091, 1100 (W.D. Va. 1995) (stating that "when an employee speaks out on behalf of other employees who have suffered discrimination, the speech is a matter of public concern"); *Merritt v. Mullen*, 49 F. Supp. 2d 846, 850 (E.D. Va.), *aff'd*, 188 F.3d 502 (4th Cir. 1999) (unpublished) (holding that speech about racial discrimination in the workplace was not of public concern because it was made primarily in plaintiff's role as a public

employee and largely constituted disagreement with policy choices and with the operations of the agency's staff).

In *Campbell*, which is the most recent guidance from the Fourth Circuit on this issue, the court noted the distinction often drawn between self-interested employment complaints and reports of discrimination in the workplace of the type to concern the public, while reemphasizing that no bright-line rule separates the two. 483 F.3d at 269. *Campbell* involved complaints by a female police officer of sexual harassment and gender discrimination by men in her department. In addition to noting that the plaintiff complained about multiple instances of inappropriate conduct directed towards her, the Fourth Circuit found that the plaintiff's complaints addressed improper treatment of other female employees and of female members of the public. *Id.* at 269-70.[7] In particular, she had complained of male police officers harassing female suspects, a matter the court felt would be of genuine interest and concern to the public. *Id.* at 270. Moreover, her written complaints spoke broadly of sexual harassment within the department. *Id.* The plaintiff did not bring the sexual harassment issues to the attention of the police department to resolve her own problems; instead, she raised them in the course of a heated conversation with a superior officer. *Id.* Under these circumstances, the Fourth Circuit held that the plaintiff "was seeking to challenge the practice [of sexual harassment] within the department as much as she was seeking a resolution of her own complaint." *Id.* The plaintiff's complaints that did not pertain to sexual harassment were treated by the court as "perceived slights" and "personal complaints and grievances about conditions of employment," and did not amount to protected speech. *Id.* at 263, 267 (describing personal complaints such as police team's failure to invite plaintiff to breakfast and sergeant's refusal to let her wash her patrol car while on duty).

---

[7] The court noted that a complaint of sexual harassment affecting only the complaining employee could constitute a matter of public interest. *Campbell*, 483 F.3d at 269.

The protected speech in *Cromer* and *Campbell* stands in contrast to Hamlette's EEO complaint. Hamlette's allegations of racial and religious discrimination in the workplace were limited to his own treatment by his supervisors because of race, religion, or other factors. His complaint did not touch upon discrimination of other employees, inmates, or the public at large, nor did it call into question the ability of the Department to carry out its mission effectively. Furthermore, the speech was made in the form of a personal employment complaint about the conditions in his workplace. In short, Hamlette only sought resolution of his own problems. Because his complaints of discrimination did not seek to further an interest beyond his narrow affairs as a public employee, they did not address matters of concern to the public. I add that no evidence has been presented that the complaint was made in the context of racial or religious tension at the Unit or public concern about the Unit's operation, which might suggest a broader problem of interest to the community. *See Love-Lane*, 355 F.3d at 777 (holding that statements made at educational advisory group on discriminatory disciplinary practices at public school was of public concern because group was convened to address exactly those sorts of issues); *Scruggs*, 900 F. Supp. at 830-31 (holding that teacher's comment on interracial dating was of public concern in part because of racial tension in school at the time and concern among black parents in the community about treatment of black students).

Even if Hamlette's allegations of racial and religious discrimination do not amount to matters of public concern, Plaintiffs argue that several other aspects of his EEO complaint merit protection due to their importance to the public. Plaintiffs take the position that Hamlette's allegation that his charge against an inmate for using vulgar language toward him was dropped discussed a matter of public safety. Plaintiffs claim that the dismissal of the charge shows the differential handling of inmate charges based on the charging lieutenant and sends a message to

inmates that they can get away with misconduct toward Hamlette. Speech on matters relating to public safety has often been found to be of public concern. *See, e.g., Goldstein*, 218 F.3d at 353-54 (firefighter's report of safety violations by emergency personnel); *Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999) (police officer's teaching of concealed handgun safety course); *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998) (testimony of public works employees on potential contamination of public water supply due to mismanagement of leachate pond designed to filter toxic runoff). But it has not been shown that Hamlette's speech addressed public safety in any way. At no point did Hamlette's EEO complaint mention concerns about his safety or the safety of other officers due to the alleged selective prosecution of one charge against an inmate. Rather, Hamlette expressed concern about being treated differently from others and feeling disrespected. He was speaking as an employee interested in his own standing vis-à-vis other employees in the workplace, not as a citizen concerned about the danger posed by inconsistent practices of inmate discipline.

My conclusion is consistent with the unpublished decision in *Nolan v. Terry*, which dealt with similar complaints brought by employees of another Virginia correctional facility. No. 7:04-cv-00731, 2006 U.S. Dist. LEXIS 65219, 2006 WL 2620002 (W.D. Va. Sept. 13, 2006). In *Nolan*, three corrections officers sued their warden and second-in-command under § 1983, claiming their transfer to other institutions was in retaliation for exercise of their First Amendment rights. 2006 U.S. Dist. LEXIS 65219, at *1. Prior to their transfer, the officers had filed several employment grievances, some of which went through multiple levels of dispute resolution, and also had sent a letter to the regional director and authored a memorandum. *Id.* at *3-6. Their speech consisted of complaints that a hearing officer failed to process disciplinary charges that the plaintiff Nolan had brought against inmates, which Nolan claimed emboldened

the inmates and endangered him and his fellow employees; complaints that his supervisors showed favoritism to the hearing officer and treated his own complaints as frivolous; and complaints that a supervisor used foul language at a staff meeting. *Id.* at *2-4. The court held that the officers' speech "[was], at base, employee grievances—complaints that their superiors, by not acceding to their demands, were not performing their work well." *Id.* at *11. With respect to the claim that the selective processing of charges endangered the corrections officers, the court stated that the plaintiffs "expressed their disagreement and dissatisfaction with defendants' handling of the matter not primarily in their role as citizens but rather primarily in their role as employees. More fundamentally, the dispute did not implicate the public's interest in receiving the well-informed views of government employees engaged in civic discussion." *Id.* The same is true of the complaints about the handling of charges against inmates in this case.

I next consider whether, as is urged by Plaintiffs, Hamlette's complaint that Mitchell told him he knew how to pressure employees to transfer or quit was a complaint of interest to the public about "corrupt leadership at the institution." Pls.' Br. Opp'n at 18. Speech on issues of public corruption certainly may be of genuine interest to the community. *See Stroman*, 981 F.2d at 157-58 (speech by a public schoolteacher about mismanagement of school budget); *Robinson*, 160 F.3d at 188 (speech by public works employees about misuse of public funds); *Hinton v. Conner*, 366 F. Supp. 2d 297, 307-08 (M.D.N.C. 2005) (speech by public employee about mismanagement and waste of public funds). Hamlette's EEO complaint provides no context for Mitchell's ambiguous statement. Whatever the statement's meaning or Mitchell's motivation for making it, it pertained to Hamlette's relationship with his supervisors at his place of work and was of no interest to the community. Hamlette's reporting of the statement can hardly be considered as revealing an instance of public corruption, and the statement was a far cry from the

improper use of public funds in the above-cited cases or the improper conduct of an official carrying out his public responsibilities.

Finally, Plaintiffs assert that Hamlette's statements "went to a culture of institutional favoritism" for certain lieutenants and retaliation against those who were not favored. Pls.' Br. Opp'n at 18. Hamlette's reports of favoritism in the workplace are employment-related grievances—spoken by Hamlette in his role as an employee—that do not address issues of concern to the community. *See Nolan*, 2006 U.S. Dist. LEXIS 65219, at *11 (finding corrections officers' complaints of favoritism by their managers to be private speech). In *Goldstein*, a firefighter had alleged that the captain suspended him for certain conduct and then later failed to suspend another firefighter for the same conduct, that he was denied access to the "Engineers room," and that the gear policy was enforced against some firefighters but not others. 218 F.3d at 353. The Fourth Circuit easily found these allegations to consist of private speech related to matters of internal policy, favoritism, interpersonal discord, and other employment-related matters. *Id.* at 352-53. The analysis in *Goldstein* counsels for dismissal of Plaintiffs' arguments on this point.

Not having found any element of Hamlette's speech to sustain his § 1983 claim, I turn to Brooks's speech. In Brooks's complaints to the EEO office and to the regional director, he reported various problems with his supervisors, including one potential instance of dressing down Brooks in front of inmates in violation of Department policy and other instances of favoritism in the Unit. As with Hamlette's allegations, these complaints were brought as an employee concerned about his interpersonal relationships with supervisors and conditions in the workplace and do not address issues of public import. Independent of those complaints, Brooks was identified as a witness in Hamlette's EEO investigation and was requested by the EEO

office to provide information on Hamlette's claims. Plaintiffs urge that Brooks's involvement in the EEO investigation "entitles his speech, regardless of whether it devolves into personal grievances, to have Constitutional protection." Pls.' Br. Opp'n at 19. Plaintiffs' position is that any speech made as part of an internal employee investigation of discrimination is of public concern because otherwise, witnesses could be suppressed, undermining the integrity and credibility of such investigations. Plaintiffs refer to law in the United States Court of Appeals for the Second Circuit to support their argument. In the Second Circuit, "any use of state authority to retaliate against those who speak out against discrimination suffered by others, including witnesses or potential witnesses in proceedings addressing discrimination claims, can give rise to a cause of action under 42 U.S.C. § 1983 and the First Amendment." *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005). "Protection of the courts' interest in candid and truthful testimony, coupled with the rights of discrimination victims to seek protection in legal action, makes testimony or prospective testimony in discrimination suits a matter of particular public interest." *Id.* Assisting a coworker's gender discrimination suit has the broader public purpose of assisting in redressing claims of discrimination and is not merely an attempt to redress personal grievances. *Id.* at 126.

While Plaintiffs may accurately characterize the law in the Second Circuit, it is my opinion that *Arvinger v. Mayor of Baltimore*, 862 F.2d 75 (4th Cir. 1988) guides this question in this circuit. In *Arvinger*, marijuana was found in a van being used by two school police officers, Stephen Arvinger and Diane Diggs. Diggs was fired because an investigation led to the belief that the marijuana was hers. She filed sex discrimination charges against the city department of education based on the alleged disparate treatment she and Arvinger received following the discovery of the marijuana. In connection with the sex discrimination suit, Arvinger was

questioned about the drug incident by an investigator of the Baltimore Community Relations Commission, and he stated that he did not know whether the marijuana belonged to Diggs. Arvinger was fired for lying, and he brought a suit claiming retaliation for speaking out on sex discrimination. The Fourth Circuit held that Arvinger's statement "was made solely to further the interests of" Arvinger and Diggs, not "to further the public debate on employment discrimination, drug policy, or any other topic." *Id.* at 79. Importantly, the district court under review in *Arvinger* had held that "[s]peech given in the course of an official investigation of discrimination unquestionably qualifies as a 'matter of public concern.'" *Id.* Addressing this point, the Fourth Circuit stated:

> The public concern determination should be based on the "content, form, and context" of the statement in question. *Connick*, 461 U.S. at 147. Although the *Connick* court did not elaborate on the relative weight to be accorded these three factors, this court has held that "content, subject-matter, is always the central aspect." *Jackson v. Bair*, 851 F.2d 714, 720 (4th Cir. 1988). The district court in this case has improperly elevated context over content. As we noted above, Mr. Arvinger was not commenting on the employment policies of the department. Furthermore, although we agree with the district court that "if co-workers were not free to exercise free speech in such a forum, those agencies of government charged with the responsibility of ridding society of discrimination would have to shut their doors forever," we are of the opinion that it is not the First Amendment, but rather § 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, that keeps those doors open. It is, in this case, irrelevant for first amendment purposes that the statement was made in the course of an official hearing.

*Id.* (citation omitted).

It is plain from *Arvinger* that the context of the speech—here, the investigation of the EEO complaint—although apposite to the court's determination, should not be "elevated" over the content, which remains "the central aspect" of the fact-specific inquiry. *See id.* There is no per se rule in this circuit that the speech of potential witnesses in proceedings addressing

discrimination claims is of public concern. In this case, that Brooks's speech was made in the context of providing information as a witness to an investigation into discrimination weighs somewhat more favorably toward finding his speech of public importance, but the content of Brooks's speech still controls. The purpose of Brooks's response to the request for information was to provide information about the charges of discrimination and favoritism made by Hamlette. Where Hamlette's EEO complaint lacked subject matter of genuine interest to the public, Brooks's commentary on the issues raised in the complaint would have similarly been bereft of substance of concern to the community. Plaintiffs cite to no evidence that Brooks's response would have concerned anything other than the narrow employment gripes articulated by Hamlette.

Because the "threshold question" of showing that Plaintiffs' speech addressed a matter of public concern has not been satisfied, *Ridpath*, 447 F.3d at 316 n.26, I need not proceed to the balancing of the employee's interest against the employer's interest or the determination of causation under the second and third prongs of the *McVey* test. Summary judgment on Count I will be entered for Defendants.

### C. Qualified Immunity

Alternatively, Plaintiffs' § 1983 First Amendment retaliation claim fails because Defendants are entitled to qualified immunity. Qualified immunity shields public officers "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is "an entitlement not to stand trial or face the

other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (internal quotations and citations omitted), *overruled in part, Pearson v. Callahan*, 555 U.S. 223 (2009). For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The law does not expect the defendant "to sort out conflicting decisions or to resolve subtle or open issues." *Campbell*, 483 F.3d at 271. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* "[W]here a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected.'" *McVey*, 157 F.3d at 277 (quoting *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995)).

There is no doubt that the broad legal principle governing this case—that public employees may not be fired on a basis that infringes on their First Amendment rights—was clearly established at the time of Plaintiffs' termination. The Fourth Circuit has directed, however, that the right in question be defined "at a high level of particularity." *Campbell*, 483 F.3d at 271. Thus, I must determine whether a reasonable corrections supervisor would have known that Hamlette's EEO complaint, Brooks's complaints to the EEO office and to Huffman, or Brooks's participation as a witness in the EEO investigation touched on a matter of public concern. My considered opinion, set forth above, is that those complaints did not address matters in which the public would have a genuine interest. Yet even assuming that portions of their speech concern issues noteworthy to the public and deserving of protection, Arthur should not be held liable for actions that a reasonable official would not understand to violate Plaintiffs'

constitutional rights. Hamlette's EEO complaint contained at least six discrete employment grievances involving various incidents in which Hamlette felt slighted by Arthur or Mitchell and concluded with the question whether he was being treated differently because he was a minister or because he was the only black lieutenant. The allegations of racial and religious discrimination were not connected to the individual incidents described in the complaint in any further detail. The central plea of the complaint was "to be treated just like all the other lieutenants." Indeed, the concerns expressed by Hamlette did not touch upon the treatment of other employees, inmates, or members of the public, nor did they contribute to public debate on issues of discrimination. Brooks's complaints were so lacking in fair employment content that no EEO complaint was filed; they largely concerned his poor relationships with his superiors and other employment matters. Clearly established law at the time provided that an employee's speech is of public concern if it addresses an issue of social, political, or other interest to a community, *see Urofsky*, 216 F.3d at 406-07, and that the content, form, and context of the speech must be taken into consideration, *Connick*, 461 U.S. at 147-48. In addition, no cases in the Fourth Circuit established that participation as a witness in an EEO investigation into allegations of discrimination is accorded protection as speech by a citizen on a matter of public concern as a matter of course. Given the lack of content in Plaintiffs' speech addressing matters of genuine concern to the community and the employment grievance context in which their concerns were raised, Arthur would not have understood his termination of Plaintiffs to clearly violate a constitutional right. *See Campbell*, 483 F.3d at 271 (finding chief of police entitled to qualified immunity where complaints "overwhelmingly addressed purely personal grievances" and the portions of plaintiff's speech that was of public concern was "not as clear and detailed as

they could be").[8]

## D. Count III: Tortious Interference with Contract

A claim for tortious interference with contract in Virginia requires existence of a valid contractual relationship, knowledge of the relationship on the part of the interferor, intentional interference inducing or causing a breach of the relationship, and damage to the party whose relationship has been disrupted. *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 144-45, 670 S.E.2d 704, 706 (2009). The interferor cannot be a party to the contractual relationship; he must be a third party. *Id.* "[W]hen a contract is *terminable at will*, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed '*improper* methods.'" *Duggin v. Adams*, 234 Va. 221, 226-27, 360 S.E.2d 832, 836 (1987) (quoting *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985)). Plaintiffs claim that Arthur intentionally interfered with their employment contract with the Department by terminating them. The parties dispute whether Arthur should be considered a third party to the employment contract. In *Fox v. Deese*, a concert promoter contracted with the City of Richmond to use the city's stadium for a concert. 234 Va. 412, 415-16, 362 S.E.2d 699, 701 (1987). The promoter sued the assistant director of the city's Department of Community Facilities, a city employee, for inducing a breach of the contract by

---

[8] My decision that Defendants are entitled to qualified immunity is further bolstered by the Fourth Circuit's unpublished opinion in *Stickley v. Sutherly*, in which the court granted qualified immunity where the employee's comments in question touched on issues of both personal and potentially public interest and where the employer undeniably had an important interest that led him to terminate employment. 416 Fed. App'x 268 (4th Cir. 2011) (unpublished). On the subject of granting qualified immunity in First Amendment retaliation claims brought under § 1983, the court stated that "the language of the *Connick* test itself and the nuanced and careful approach the test requires lead to the conclusion that an employee's right to speech in any particular situation will often not be immediately evident." *Id.* at 272. Classifying speech requires "a highly fact-intensive inquiry" in which "the line marking when something becomes a matter of public concern is blurry, and thus the boundary confining a public official's behavior is hard to discern." *Id.* For complaints of racial or religious discrimination of public employees in the workplace, as Arthur was faced with in this case, divining when speech is protected can be challenging, especially where the alleged discrimination pertains to only one employee.

delaying the offering of concert tickets for sale. *Id.* at 420, 362 S.E.2d at 704. The court held

that if the assistant director was acting within the scope of his employment with the city, then he

was acting as an agent of the city and he was not a third party who could interfere with the

contract. *Id.* at 427, 362 S.E.2d at 708; *see also Stronach v. Va. State Univ.*, 631 F. Supp. 2d

743, 753 (E.D. Va. 2008) (employees of state university could not interfere with plaintiff's

employment contract if they were acting within scope of employment with university).

It is not disputed that Arthur's actions must fall outside of the scope of his employment

with the Department in order to support a claim for tortious interference with contract.

Generally, an act is within the scope of employment if (1) it was expressly or impliedly directed

by the employer, or is naturally incident to the business, and (2) it was performed, although

mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some

impulse or emotion that was the natural consequence of an attempt to do the employer's

business, and did not arise wholly from some external, independent, and personal motive on the

part of the employee to do the act upon his own account. *Kensington Assocs. v. West*, 234 Va.

430, 432, 362 S.E.2d 900, 901 (1987). When an employer-employee relationship has been

established, the burden is on the employer to prove that the employee was not acting within the

scope of his employment when he committed the act complained of. *Id.* at 432-33, 362 S.E.2d at

901. Defendants maintain that Arthur's issuance of disciplinary notices against Hamlette and

Brooks was done within the scope of his employment because he supervised Hamlette and

Brooks and had the authority to terminate them. I agree. Arthur, as Superintendant of the Unit,

had supervisory authority over Plaintiffs and the express authority to issue disciplinary notices to

employees who violate departmental regulations. He reasonably believed that the actions and

omissions of Hamlette and Brooks on August 30, 2006 contravened numerous polices and

regulations and warranted sanction.[9]  Disciplining Plaintiffs was an attempt to further the Department's interest and do the Department's business.  A claim for tortious interference with contract cannot be sustained under these circumstances.

## IV. CONCLUSION

For the reasons stated above, I will grant Defendants' Motion for Summary Judgment (docket no. 66) on all counts.  An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this _26th_ day of July, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[9] Indeed, evidence in the record indicates that Hamlette and Brooks acknowledged their conduct violated prison security rules in some respects.  *See* Brooks Dep. 72:17-73:12 (conceding that inmates in the kitchen must be supervised and he left them unsupervised for about thirty minutes); *id.* at 83:3-9 (stating that he deserved discipline for his actions but disputing propriety of a Group III notice); Mitchell Decl. ¶ 5 (attesting that in meeting after August 30, 2006, Hamlette told him that Hamlette failed to ensure the security posts were manned as required).